VICTOR SHERMAN (SBN 38483)
Law Offices of Victor Sherman
11400 Olympic Blvd., Suite 1500
Los Angeles, CA 90064
Phone: (424) 371-5930
Fax:    (310) 399-9029
Email: victor@victorsherman.law

Attorneys for Defendant,
BRADFORD SHEPLEY

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | NO. 20-00038-DSF |
|---|---|
| Plaintiff, | NOTICE OF MOTION AND MOTION TO DISMISS COUNT TWO OF INDICTMENT; MEMORANDUM OF POINTS AND AUTHORITIES; EXHIBITS DECLARATIONS |
| v. | |
| BRADFORD SHEPLEY, | |
| Defendant. | Date:    May 24, 2021<br>Time:    9:00 a.m.<br>Place:   Courtroom of the Hon. Dale S. Fischer |

TO THE CLERK OF THE COURT AND TO THE UNITED STATES AND ITS DESIGNATED ATTORNEY:

PLEASE TAKE NOTICE that on May 24, 2021 at 9:00 a.m., or as soon thereafter as counsel may be heard, defendant Bradford Shepley will move this court to dismiss Count Two of the Indictment as being based on insufficient and incompetent evidence.

The ground for this motion is that the evidence, which fails to prove heroin was the cause of death, cannot possibly support a lawful and just verdict.

This motion is based on this Notice of Motion and Motion, the records and files in this case, Rule 12(b) of the Federal Rules of Criminal Procedure, the Due Process Clauses of the Fifth and Fourteenth Amendments, and on such evidence and argument as may be presented at a hearing on this motion.

1

**TABLE OF CONTENTS**

2

<u>Page No.</u>

3

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

4

Memorandum of Points and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

5

   Facts and Medical Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

6

       A.    Defendant's Experts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

7

       B.    The Amount of Heroin in the Decedent's Blood was Below

8

               the Level Typically Found in Fatal Overdoses . . . . . . . . . . . . .  3

9

       C.    Failure to Rule Out other Substances as a Cause of Death  . . .  4

10

       D.    Insufficient Toxicology Data  . . . . . . . . . . . . . . . . . . . . . . . . . .  6

11

       E.    The Physical Condition of the Body was Inconsistent with

12

               Overdose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

13

       F.    Other Potential Causes of Death . . . . . . . . . . . . . . . . . . . . . . . .  8

       G.    The Failure to Preserve the Evidence Has Rendered it

14

               Impossible to Determine the Cause of Death.. . . . . . . . . . . . .  9

15

   Argument

16

       A.    The Toxicology Evidence is Insufficient to Establish

17

               a Cause of Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

       B.    In Order to Convict, Heroin Must Have Been the "But-For"

18

               Cause of Death  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

19

       C.    The Government's Follow-Up Interview with the County's

20

               Medical Examiner Fails to Clear Up Any Infirmities  . . . . . .  13

21

       D.    The Government Failed to Preserve Critical Evidence  . . . . .  14

22

       E.    The Only Remedy Is to Dismiss Count Two  . . . . . . . . . . . . .  17

23

       F.    The Court Must Hold a Hearing on the Admissibility of the

               Toxicological Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

24

25

   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

26

27

28

1

# TABLE OF AUTHORITIES

**PAGE**

2

3
Arizona v. Youngblood,
    488 U.S. 51 (1988) ................................................................. 14, 16

4
Burrage v. United States,
    571 U. S. 204 (2014) .................................................. 11, 12, 14, 15

5

6
California v. Trombetta,
    467 U.S. 479 (1984) ......................................................... 15, 17

7
Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579 (1993) ..................................................... 20, 21, 22

8
General Electric Co. V. Joiner,
    522 U.S. 136 (1997) ................................................................. 22

9

10
Krieger v. United States,
    842 F.3d 490 (7th Cir. 2016) ................................................ 15, 16

11
United States v. Barletta,
    644 F.2d 50 (1st Cir. 1981) .................................................... 19

12

13
United States v. Belcher,
    762 F. Supp. 666 (W.D. Va. 1991) ......................................... 16

14
United States v. Belcher,
    769 F. Supp. 201 (W.D. Va. 1991) (dismissing ....................... 16

15

16
United States v. Coia,
    11 Cir., 1983, 719 F.2d 1120 ................................................. 17

17
United States v. Conley,
    859 F. Supp. 909 (W.D. Pa. 1994) ......................................... 19

18

19
United States v. Covington,
    1969, 395 U.S. 57, 89 S.Ct. 1559, 23 L.Ed.2d 94 ............... 18, 20

20
United States v. Jones,
    6 Cir., 1976, 542 F.2d 661 ................................................ 17, 18

21

22
United States v. Korn,
    5 Cir., 1977, 557 F.2d 1089 .................................................. 17

23
United States v. Miller,
    5 Cir., 1974, 491 F.2d 638 ................................................... 17

24

25
United States v. Shortt Accountancy Corp.,
    785 F.2d 1448 (9th Cir. 1986) ........................................... 18, 19

26
United States v. Solomon,
    753 F.2d 1522 (9th Cir.1985) ................................................ 22

27

28
University of Tex. Southwestern Medical Center v. Nassar,
    570 U.S. 338 (2013) .................................................... 12, 13, 14

## MEMORANDUM OF POINTS AND AUTHORITIES

### Facts and Medical Evidence

Bradford Shepley moves to dismiss Count Two, which alleges that heroin he obtained resulted in the death of K.S.  The evidence fails to establish a cause of death, let alone that the cause of death was from heroin that Shepley procured.

The known facts, as established in the record, are that K.S. contacted Jonathan Lowe at around 2:30 in the afternoon of November 5, 2017 about procuring some heroin.  Lowe later arranged to have defendant Shepley obtain heroin from Manny's delivery service, a now-defunct high-volume heroin distributor in the Los Angeles area.  Later, a little after 4:00 in the afternoon, K.S. met with Lowe and Shepley.

K.S. was last been seen alive at around 11:00 p.m. on November 5, approximately seven hours after purchasing heroin from Lowe.[1]  When police entered the K.S.'s bedroom at his parents' home, they encountered a small pharmacy of medications to treat his anxiety, depression, insomnia, panic disorder, opioid dependence, and bipolar disorder.  The various pill bottles around the room contained at least ten different medications prescribed by at least four different physicians.

All of the bottles contained unused pills.

An autopsy was performed on November 7, 2017 with only femoral blood and urine samples having been taken.  No bodily tissues or blood from other parts of the body were preserved.  Toxicology was performed at National Medical Services Laboratory using the femoral blood samples only.  The results of that testing – 88 ng/mL of free morphine – was considerably below the typical blood

---

[1] In addition to the lack of evidence that heroin was the cause of death, the defendant is unaware of any evidence that establishes a connection between the heroin submitted for toxicological analysis and the specific heroin that K.S. purchased through Lowe.

concentration found in cases of fatal overdose.  Nonetheless, the Ventura County Medical Examiner identified "heroin intoxication" as the cause of death. Additional testing, using the same femoral blood sample was performed by Alere Forensics, which detected a similarly low-level of the metabolites associated with heroin use.

A.   *Defendant's Experts*

To assist with understanding the results of medical tests Defendant retained the services of two esteemed toxicologists, Marvin Pietruszka, M.D., M.Scd., F.C.A.P. and John Treuting, Ph.D., to review the medical findings and offer their opinions.

Dr. Pietruszka, who has degrees in both medicine and law, has also done postgraduate work in toxicology and applied toxicology.  He has served on the American Board of Pathology, the American Board of Preventive Medicine, and the American Board of Forensic Toxicology.  At present, he serves as the Director or Medical Director at Del Carmen Medical Center, Psychemedics Inc. Toxicology Laboratory, and H.I.B.M. Genetics Research Laboratory.  He also teaches as a Clinical Associate Professor of Pathology at the University of Southern California, Keck School of Medicine.  He was awarded the Keck School of Medicine Professor of the Year in both 2002 and 2004.  Since 1976, he has published 27 books and articles in both English and Spanish.

Dr. Treuting has a Ph.D. in clinical and forensic toxicology from the Medical College of Virginia.  He also holds degrees in pharmacy and medicinal chemistry.  He is licensed in California as a Clinical Toxicologist Scientist.  Dr. Treuting started his career in the military where he was attached to William Beaumont General Hospital in El Paso, Texas, and directed a clinical/forensic toxicology laboratory.  After returning to civilian life, he spent much of the 1970s in Texas where he worked as a researcher, toxicologist and Assistant Professor. After moving to California in 1981, Dr. Treuting served in management at a

number of laboratories.  In 1992, he became the President and CEO of Forensic Toxicology Associates, a subsidiary of Pacific Toxicology Laboratories in Los Angeles, California.  In this capacity he regularly provided expert witness testimony and litigation support to the San Diego District Attorney's Office.  Since 2006, Dr. Treuting has served as a consulting toxicologist to a number of organizations, including the California Medical Board.

In their reports, Doctors Pietruszka and Treuting independently concluded that the blood sample evidence was inconclusive and inconsistent with the levels of morphine intoxication that is found when death more often occurs.  Because of this, Dr. Pietruszka states that "the specific cause of death in this case cannot be definitively determined."  Exhibit A.  Dr. Pietruszka specifically disagreed with Dr. Christopher Young, the Chief County Medical Examiner, who opined as to the cause and manner of death.  According to Dr. Pietruszka, Young's diagnosis was conclusory and "not supported by clinical, autopsy, or toxicologic findings."  *Id*.

Consistent with Dr. Pietruszka, Dr. Treuting relates that "the low levels of the metabolites in the blood make it impossible to determine that heroin was the cause of death."   Exhibit B.

In addition to the reports that they submitted under their own names, Pietruszka and  Treuting submitted a joint summary of the reasons why they find that the toxicology results are scientifically and medically insufficient to prove that heroin was the cause of death in this case.  Exhibit C.

**B.** ***The Amount of Heroin in the Decedent's Blood Was Below the Level Typically Found In Fatal Overdoses***

Dr. Treuting notes that the free morphine levels found in K.S.'s blood, 88 ng/ml, was considerably less than the average concentration found in overdose deaths.  Exhibit B.  The literature on the subject establishes that the most reliable predictor for overdose death is when a user's blood-level concentration exceeds 240 ng/ml of unconjugated morphine levels.  See Exhibit B (citing Jones,

1  *Concentrations of free morphine in peripheral blood after recent use of heroin in*
2  *overdose deaths and apprehended drivers* (J. Foren.Sci. 2011); Spiehler,
3  *Computer-assisted interpretation in forensic toxicology: morphine-involved*
4  *deaths*, 34(5) J.Foren.Sci. at 1104-1115 (1989).  *Id*.

5  According to Dr. Pietruszka, the extremely low level of heroin metabolites
6  found in the blood sample suggests that the heroin had significantly metabolized
7  by the time death occurred.  Exhibit A.  It was thus critical that an alternate cause
8  of death should have been considered.

9  Mr. Sands' morphine level was recorded at .08 mg/L, more than 3 to 4
10  times less than the average decedent's morphine level in the published
11  literature.  Similar levels are also described in other studies.  The
12  significance of the very low metabolites is that the risk of opiate
13  induced respiratory depression is markedly reduced, thus, reducing the
14  risk of death.

15  Exhibit A.

16  Dr. Pietruszka observed that the characteristic autopsy findings of heroin
17  users were either not identified in this case or, worse, were not considered.  For
18  example, "The absence of such basic autopsy findings as miotic pupils and
19  peripheral cyanosis and the finding of borderline pulmonary edema raises concern
20  regarding the accuracy of the diagnosis of opioid (heroin) intoxication."  *Id*.

21  **C.**     ***Failure to Rule Out other Substances as a Cause of Death***

22  As noted, there were at least ten other medications found at the death scene
23  along with narcotics paraphernalia.  Both doctors found it particularly
24  disconcerting that the toxic effects of polypharmacy were not considered.
25  Commenting on what the superficial examination conducted by Christopher
26  Young, the Ventura County Chief Medical Examiner, Dr. Pietruszka was stunned
27  that "Dr. Young's cause of death appears to be based solely upon the presence of
28  low levels of heroin metabolites."  As an example, Dr. Pietruszka points out that

4

K.S. had been prescribed multiple medications that had a potential for causing a cardiac arrhythmia.  Yet, the risk of a fatal arrhythmia in association with bipolar disorder was never considered as a cause of death, even though clinical evidence correlates arrhythmias with bipolar disorder.

For the same reasons, Dr. Treuting found that insufficient examination and testing had been performed to opine on the cause of death.  Among the multiple prescription bottles found in the room were bottles containing olanzapine, trazadone, quietiapine and aripiperazole, all of which affect the neurotransmitter, serotonin.  Treuting advises that adverse drug-drug interactions could cause serotonin toxicity or a serotonin storm, which are life-threatening syndromes.  Exhibit B.

Dr. Pietruszka emphasizes that the effect of drugs in combination can be markedly distinct from the way users respond to individual drugs.

> When combined with the cardiac effects of atypical antipsychotics and anti-depressant medications, the substance abuser is placed at a significant increased risk of sudden cardiac death.  This risk is independent of the death risk of heroin administration.

Exhibit A.  This accords with Dr. Treuting's belief that the other substances in the decedent's blood should have been ruled out as a cause of death.

> In addition to his addiction and historic tolerance to heroin, other significant contributory factors to consider include his preexisting mental health issues and the use of multiple antidepressant medications, which were prescribed by several different physicians.  Any of these other drugs could have created significant adverse drug-drug interactions producing serotonin toxicity or a serotonin storm, which can be life threatening.

Exhibit B.

In agreement, Dr. Pietruszka feels strongly that, based on the weak evidence

5

of heroin overdose as the cause of death, alternative causes should have been considered.  Pointing out that the autopsy finding of pulmonary congestion suggests that death was sudden, this observation is consistent with a fatal cardiac arrhythmia.  Exhibit A.  Because the laboratory failed to examine other likely causes of death, Dr. Pietruszka does not believe that it is possible to conclusively point to a cause of death:

> It is my opinion that the specific cause of death in this case cannot be definitively determined.  Much consideration should be given to the potential for the atypical psychotic and antidepressant medications as a potential cause of sudden cardiac death from medications that Mr. Sands has been prescribed.  The characteristic observational findings for heroin toxicity were not observed at the time of autopsy.

*Id*.

## D.    Insufficient Toxicological Data

Dr. Treuting found it particularly disturbing that the laboratories only analyzed femoral blood and never collected samples of vitreous humor, liver, kidney or brain tissues. Exhibit B.

According to Dr. Treuting, the failure to collect additional blood and tissue samples was contrary to his training as a medical examiner to obtain a more accurate interpretation of the effects of drug use on the decedent.  Treuting found the minimal collection of samples to be remarkably inadequate.  He was even more surprised to see that a urine sample was collected but was never tested.  The failure to perform broader testing and to rule out other causes of death is only all the more disconcerting in light of low concentrations of opiates actually found in blood testing. Treuting explains that the lack of basic medical information from the toxicology screen makes it scientifically impossible to reach a conclusion about the cause of death.

In a distribution study that included other tissues including liver,

6

1   vitreous humor and urine, such a multi-specimen analytical approach

2   would have afforded a more meaningful and·thorough evaluation in

3   this forensic investigation. Vitreous humor is useful. for determining

4   6-MAM and morphine levels.

5   *Id*.

6       In fact, Dr. Treuting reports that the liver is the primary tissue for use in

7   post- mortem toxicological analyses because it is the body organ where most drugs

8   and toxicants are metabolized.  *Id*.  In this case, the Medical Examiner's report

9   indicates that the liver was removed and weighed.  No sample, however, was taken.

10  As a result, the organ that could have provided a wealth of information on the

11  cause of death in an alleged overdose case was simply ignored.  Exhibit C.

12  **E.**    ***The Physical Condition of the Body Was Inconsistent with Overdose***

13      It is not just that the toxicology reports are fatally inconclusive, the

14  examination of the body provided clues that overdose was not the cause of death.

15  As Dr. Pietruszka observes:

16      The readily identifiable miotic pupils of opiate medication usage and

17      the finding of cyanotic fingernails resulting from respiratory

18      insufficiency were not observed at autopsy. The absence of such basic

19      autopsy findings as miotic pupils and peripheral cyanosis and the

20      finding of borderline pulmonary edema raises concern regarding the

21      accuracy of the diagnosis of opioid (heroin) intoxication.

22  Exhibit A.

23      Pietruszka further explains that the common physical indicators of heroin

24  use were not observed to have been present during the autopsy.

25      Of significance, the most common anatomic autopsy findings of

26      heroin usage were not encountered. These include the presence of

27      birefringent crystals in lung or liver, pneumonia, hepatic steatosis,

28      coronary artery and aortic atherosclerosis, hepatitis, myocardial

7

1    fibrosis, cerebral edema, miosis (pinpoint pupils) and cyanosis.

2    *Id*.

3         Based on these observations, both Dr. Pietruszka and Dr. Treuting strongly

4    agree that a competent examiner would have ruled out other causes of death.

5    Heroin overdose typically causes death by depressing the respiratory system.

6    However, in the case of K.S., he did not show physical signs of anoxia at the time

7    of death.  The fact that K.S. did not present with physical markers consistent with

8    heroin abuse made it imperative to look for other causes of death.

9    **F.**   ***Other Potential Causes of Death***

10        In addition to the likelihood that K.S. succumbed to the cocktail of

11   medications that he was taking at the time of his death, the evidence indicates other

12   possible causes of death that should have been investigated.  Among them, Dr.

13   Pietruszka points out a clinically documented correlation between bipolar disorder

14   and cardiac arrhythmia.  This is in addition to the known effects of several of the

15   medications K.S. was taking that cause arrhythmia as a side effect or in

16   combination with other drugs.  The presence of ten prescription drugs along with

17   narcotics presents a very complicated pharmacological picture.  Dr. Pietruszka

18   explains:

19        In this case, a number of alternative causes of death must be

20        considered. This would include the risk of a fatal cardiac arrhythmia.

21        In this case, the actual history of drug use is not known. It is also not

22        uncommon for drug users to have used a broad variety of drugs, even

23        years prior to their deaths. A history of prior drug use places the

24        individual at an increased risk of suffering a sudden cardiac death

25        from a fatal cardiac arrhythmia. The autopsy finding of pulmonary

26        congestion suggests that death was sudden as in the case of a fatal

27        cardiac arrhythmia.

28   Exhibit A.

1  In addition, Dr. Pietruszka considers that the decedent's overall physical
2  fitness combined with any number of the medications he was prescribed could be
3  an independent cause of death.

4  > Also not considered as a potential cause of premature death is the role
5  > of low cardiorespiratory fitness in drug users. Drug use is known to
6  > impair cardiac autonomic regulation and heart rate variability in
7  > response to stressors. When combined with the cardiac effects of
8  > atypical antipsychotics and anti-depressant medications, the substance
9  > abuser is placed at a significant increased risk of sudden cardiac death.
10 > This risk isindependent of the death risk of heroin administration and
11 > would explain, in part, the substantially greater risk of mortality of
12 > heroin users when compared to the general population.

13 *Id*.

14 **G.**  ***The Failure to Preserve the Evidence Has Rendered it Impossible to***
15      ***Determine the Cause of Death***

16 Based on Dr. Pietruszka and Dr. Treuting's findings, it is clear that heroin
17 has not been shown to be the cause of death in this case.  This is particularly
18 unsettling in light of the fact that the samples have been destroyed.  Inasmuch as
19 defendants' experts have found that the low levels of metabolites found in K.S.
20 blood make it impossible to determine the cause of death, the onus of the failure to
21 preserve the evidence for further testing should be held to be upon the government.

22 In this regard, it is significant that the government was well aware of both
23 the importance of retaining a sample for the defense and the laboratory's policy of
24 destroying samples after two years.  This had all come up before – in April 2019 –
25 when an attorney for another defendant inquired about obtaining a sample, the
26 government was advised at that time about the laboratory's retention policy.

27 Also, at that very same time, the government was well aware that it intended
28 to charge Bradford Shepley and that the blood sample would be a central piece of

9

1   evidence.  In fact, it now appears that the government intends to rely entirely on

2   the inadequate testing performed in 2017.  Nonetheless, the government declined

3   to preserve the blood evidence that it now intends to argue will prove Shepley's

4   guilt – in spite of the low level of heroin metabolites and failure to consider other

5   causes of death.  Dr. Treuting laments how the loss of this evidence has made it

6   impossible to determine the cause of death.

7           Had the decedent's specimens been retained and not destroyed before

8           the case was closed, it would have permitted the defendant to initiate

9           his own independent toxicology testing.  Unfortunately, any

10          remaining samples were destroyed prior to Bradford Shepley's

11          indictment.

12  Exhibit B.

13                                          **Argument**

14  **A.    *The Toxicology Evidence Is Insufficient to Establish a Cause of Death***

15          As this case stands, the government intends to argue that the heroin that K.S.

16  allegedly obtained through Shepley was the cause of K.S.'s death based solely on

17  evidence that K.S. had used heroin.  As defendant's experts explain, it is

18  impossible to draw the conclusion that heroin was a cause of death based on the

19  evidence collected.  In fact, the low level of metabolites concentrated in the

20  decedent's blood strongly suggests another cause of death.

21          This failure of evidence would be less consequential if anyone had the

22  ability to perform proper testing, using standardized samples and ruling out other

23  causes of death.  Neither is possible, however, because of the way that the

24  scientific evidence was handled in this case.  First only femoral blood and urine

25  samples were obtained, leaving uncollected any samples of vitreous humor or liver,

26  kidney or brain tissues. As Dr. Treuting points out, the liver tissue, in particular,

27  could have been invaluable.  Exhibit B.  Then, neither laboratory that performed

28  testing ever examined the urine sample.  Now, only after Shepley has been charged

                                              10

1   more than two years after the fact, there are no samples available to test – even

2   though the tests that were performed showed only a very weak correlation between

3   K.S.'s heroin consumption and his death.  Nevertheless, it is based on this evidence

4   that the government intends to go to trial and seek to impose an exorbitant sentence

5   on a drug addict who was the alleged hapless middle-man for a transaction

6   involving less than a gram of heroin.

7         This charge is as outrageous as it is unsupported by the evidence.  The only

8   thing more repugnant is the government's willingness to go forward with this

9   faulty evidence, knowing that the destruction of the evidence means that the

10  defendant has no ability to properly test it.

11  **B.**     ***In Order to Convict, Heroin Must Have Been the "But-For" Cause of***

12          ***Death***

13         The Supreme Court has held that in cases of death by heroin intoxication,

14  the use of heroin must be shown to have been the"but for" cause of death. *Burrage*

15  *v. United States*, 571 U. S. 204, 218-19 (2014). In *Burrage*, the Court reversed

16  after finding as a matter of law that the evidence failed to show that heroin use was

17  the but-for cause of the death or injury.  *Id*.  At least part of the reason why it

18  heroin could not be determined to be the cause of death was because of the

19  presence of several other drugs in the decedent's blood.  *Id*. at 207.  By contrast,

20  K.S. was not tested for other drugs, despite the abundant evidence of polysubstance

21  abuse at the death scene.

22         In concluding that heroin must be more than a mere contributing factor in a

23  death, the Supreme Court relied on the language used in the statute, which requires

24  that death result from heroin use.  It is not enough the heroin may have facilitated

25  the death in some amorphous measure.

26          The language Congress enacted requires death to "result from" use of

27          the unlawfully distributed drug, not from a combination of factors to

28          which drug use merely contributed. Congress could have written

11

1    §841(b)(1)(C) to impose a mandatory minimum when the underlying

2    crime "contributes to" death or serious bodily injury, or adopted a

3    modified causation test tailored to cases involving concurrent

4    causes…

5  *Id*. at 216.  In the view of the Court, any effort to modify the "but-for" test in order

6  to apportion causation will prove unwieldy and, worse still, will produce arbitrary

7  outcomes.

8    Is it sufficient that use of a drug made the victim's death 50 percent

9    more likely? Fifteen percent? Five? Who knows. Uncertainty of that

10    kind cannot be squared with the beyond-a-reasonable-doubt standard

11    applicable in criminal trials or with the need to express criminal laws

12    in terms ordinary persons can comprehend.

13  *Id*. at 218.  As the Court recognized, the statute cannot be satisfied by merely

14  showing that a person died while intoxicated, or as was the case here, that the

15  decedent had a nonlethal concentration of metabolites in his blood.  To the

16  contrary, *Burrage* holds that it is essential to a prosecution that it be proven that, in

17  the absence of the heroin use, the person would be alive.  The government's

18  evidence, which fails to account for other likely causes of death, fails to meet this

19  standard.

20    Accordingly, unless the evidence is sufficient to support a finding of but-for

21  causation beyond a reasonable doubt, the charge should never be submitted to a

22  jury.  As defendant's experts have established, the evidence in this case cannot

23  meet that standard.  Simply showing that heroin was in K.S.'s blood is wholly

24  incapable of proving "'that the harm would not have occurred' in the absence

25  of—that is, but for—the defendant's conduct." Id. at 211 (citing *University of Tex.*

26  *Southwestern Medical Center v. Nassar*, 570 U.S. 338, 346 (2013)).

27  **C.**    ***The Government's Follow-Up Interview with the County's Medical***

28    ***Examiner Fails to Clear up Any Infirmities***

1        The only thing that the government's follow-up interview with Dr .

2   Christopher Young, Ventura County's Chief Medical Examiner, is how little he is

3   concerned with the quality of the evidence.  When Young was interviewed on

4   December 3, 2020, he claimed to have nothing to add or change in his original

5   findings, despite the evidence that the amount of heroin was insufficient to cause

6   overdose and the failure to investigate other causes of death.  Exhibit E.  While Dr.

7   Young claims that poly-drug testing was performed, there is no evidence of this

8   other than that a third-party test incidentally showed that quetiapine, a medication

9   to treat bipolar disorder, was also present.  *Id*.  It would also appear that the

10  Medical Examiner's opinion is based entirely on the National Medical Service

11  analysis, which tested only for barbiturates, cannabinoids, salicylates, acetone,

12  ethanol, isopropanol, and methanol, none of which would have turned up the

13  pharmacy of strong medications that K.S. was using at the time of his death.

14       Clearly, there was no consideration mention of drug interactions, and Dr.

15  Young candidly admits that he is unaware that there is clinical evidence of sudden

16  death among bipolar patients.  *Id*.  Apparently, Dr. Young is also unaware of

17  clinical research, such as that performed by psychiatrist Pao-Huan Chen, who

18  found that the risk of sudden cardiac death is remarkably high in patients with

19  bipolar disorder, especially when, like K.S., they are under 30 years old.

20  Statistically, about one percent of bipolar patients experienced sudden cardiac

21  death.  See Chen P, Tsai S., et. al., *Incidence and risk factors of sudden cardiac*

22  *death in bipolar disorder across the lifespan*, Sept. 2020, Journal Affect Disorder,

23  at pp. 210-217.  Nor was he aware of the work by Mehmet Gurkan Gurok that

24  specifically seeks to correlate risks from bipolar disorder with death.  As Dr. Gurok

25  notes, " In patients with BD, the risk of mortality associated with CVD has been

26  reported to be 8 times higher in patients younger than 40 years of age compared to

27  the general population."  Gurok MG, et. al., *QT and P-wave dispersion during the*

28  *manic phase of bipo1ar disorder*, Jul 3, 15 Neuropsychiatric Dis Treat at pp.

13

1805-1811.  Among the collateral factors associated with death are smoking, unhealthy diet, and lack of exercise, in addition to the drug use, including those to treat the disorder, and metabolic issues  involved in the pathophysiology of bipolar disorder.  *Id.*

Dr. Young's defense of his conclusion falters insofar as he fails in any way to tie the observed amount of heroin in the decedent's blood to his death.  Nor does it appear that investigators were interested in confirming Young's results.  While Dr. Young seemed to acknowledge that the morphine concentrations were at pre-morbid levels, he opined, nevertheless, that "very high levels of heroin do not need to be detectable in heroin overdose deaths."  Id,  While this may be true, it doesn't amounts to more than a claim that heroin could have been a contributing factor in the death.  Under *Burrage,* such a prosecution is prohibited.  Finding that the drugs defendant supplied contributed to the victim's death or injury is not at all the same as finding that it was a but-for cause.  571 U.S. at 206.

Because Dr, Young's evidence shows only that heroin could have been one factor contributing to the death of K.S., it is legally insufficient to prove the charge in Count Two.  Now that the physical evidence has been destroyed, there is no way to determine with any legal certainty how K.S. died.

**D.** *The Government Failed to Preserve Critical Evidence*

In light of the importance of these samples and the fact that Shepley was unrepresented by counsel and had no notice of the charges when the samples were destroyed, the failure to preserve this essential evidence amounted to bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). This was tantamount to a "a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland*." *California v. Trombetta*, 467 U.S. 479, 488 (1984).[2] The duty to

---

[2] "The capacity to preserve breath samples is equivalent to the actual possession of samples." *Trombetta*, 467 U.S. at 488 n.7.

14

preserve evidence comes into play when the evidence in question "might be expected to play a significant role in the suspect's defense." *Id*. at 489.

> To meet this standard of constitutional materiality ..., evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.*

In this case, the defendant's guilt or innocence may very well turn on this singular piece of evidence – the blood of the decedent at the time of death – that cannot possibly be obtained by any other means. The government was well aware of this, just as it was of Shepley's imminent prosecution – when it was given notice that the sample would be destroyed and did nothing to preserve Shepley's rights. Exhibit D. While this evidence had the ability to suggest guilt, it also had the ability to be exculpatory, either by showing another cause of death or that the heroin that caused the overdose did not come from Shepley.

Unless, it can be shown that the defendant could not have survived the amount of drugs ingested or that all other likely causes of death have been ruled out, it is impossible to demonstrate that a heroin overdose was a but-for cause of death. As courts have emphasized, the problem is that only testing for one drug in the decedent's system "in a landscape requiring but-for causation, makes a difference." *Krieger v. United States*, 842 F.3d 490, 505 (7th Cir. 2016). This was the core problem in *Burrage* . The deceased had taken multiple drugs, and there was no way to opine from the evidence that the death would not have occurred if the decedent had not used heroin.

It's the same here. There is no evidence that the dose of heroin that K.S. used killed him. All the evidence shows is that he used heroin before he died. As the defendant in *Krieger* pointed out, "if before any testing or investigation there is

15

1  a 50% chance a victim died from Drug A and a 50% chance the same person died
2  from Drug B, can causation determination be made if only Drug A was tested?"
3  *Id*.

4         While *Youngblood* requires bad faith when there has been spoliation of
5  certain kinds of evidence, the prosecution in *Youngblood* "did not attempt to make
6  any use of the [lost evidence] in its own case in chief." *United States v. Belcher*,
7  762 F. Supp. 666, 672 (W.D. Va. 1991) (citing *Youngblood*, 488 U.S. at 56). Nor
8  was the destroyed evidence in *Youngblood* "absolutely crucial and determinative to
9  this prosecution's outcome." *Id*.; see also *United States v. Belcher*, 769 F. Supp.
10  201, 204 (W.D. Va. 1991) (dismissing indictment for due process violation). By
11  contrast, the prosecution cannot proceed with Count Two of the indictment against
12  Shepley without using the fruits of the destroyed blood evidence in its
13  case-in-chief.  The same evidence will undeniably be determinative of the
14  prosecution's outcome. Under such circumstances, bad faith need not be proved
15  because the facts speak for themselves and the due process violation is manifest.
16  *Id.*

17         If any party is to bear the burden or prejudice from the destruction of
18  evidence in this case, it should be the government, which was well aware that it
19  intended to indict Bradford Shepley even as it allowed the very evidence on which
20  it relied to be purged from the case.  With the government now seeking to hold
21  Shepley responsible for a death, even though its evidence is equivocal at best about
22  the cause, the court should and must dismiss the charge in Count Two.  Because it
23  is clear that the toxicological evidence is insufficient to prove the charge, the
24  allegation should not be brought to trial.

25         Where the importance of the evidence was clear and likelihood that the
26  defense would need to independently test it was manifest, it was misconduct to
27  knowingly allow essential evidence to be taken from the defense. *Trombetta*, 467
28  U.S. at 485 ("defendant has a constitutionally protected privilege to request and

1  obtain from the prosecution evidence that is either material to the guilt of the

2  defendant or relevant to the punishment to be imposed").

3       Because the toxicology reports do not establish a cause of death and the

4  government's inaction has made further testing possible, there is no equitable

5  remedy or disposition short of dismissing charge for lack of evidence.

6  **E.**     ***The Only Remedy Is to Dismiss Count Two***

7       Under Rule 12(b) of the Federal Rules of Criminal Procedure, this Court

8  may entertain any defense raised in a pretrial motion "which is capable of

9  determination without the trial of the general issue."  While the issue of the cause

10  of death is ostensibly factual in that it relates to the sufficiency of the evidence, it

11  also presents manifestly justiciable legal issues.

12       A pretrial motion is generally "capable of determination" before trial

13       if it involves questions of law rather than fact. *United States v. Korn*, 5

14       Cir., 1977, 557 F.2d 1089, 1090; *United States v. Jones*, 6 Cir., 1976,

15       542 F.2d 661, 664; *United States v. Miller*, 5 Cir., 1974, 491 F.2d 638,

16       647. However, "a district court may make preliminary findings of fact

17       necessary to decide the questions of law presented by pre-trial

18       motions so long as the court's findings on the motion do not invade

19       the province of the ultimate finder of fact." *Jones*, 542 F.2d at 664

20       (footnote omitted). See *United States v. Coia*, 11 Cir., 1983, 719 F.2d

21       1120, 1123. As the ultimate finder of fact is concerned with the

22       general issue of guilt, a motion requiring factual determinations may

23       be decided before trial if "trial of the facts surrounding the

24       commission of the alleged offense would be of no assistance in

25       determining the validity of the defense." *United States v. Covington*,

26       1969, 395 U.S. 57, 60, 89 S.Ct. 1559, 1561, 23 L.Ed.2d 94 . See 8

27       Moore's ¶ 12.04[1] at 12–39 (1985).

28  *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452–53 (9th Cir.

1   1986).

2       In as much as there is no more toxicology testing to be performed, the facts
3   are fixed.  The Court is thus presented with the question of whether the mere
4   presence of heroin in the decedent's blood, at a level considerably below that
5   ordinarily considered lethal, is sufficient evidence by which a jury could do
6   anything more than guess at the cause of death.  It must also consider the presence
7   of numerous other drugs, as the Supreme Court did when it held in *Burrage* that
8   one substance could not be found to be the but-for cause of death.  In
9   contemplation of any doubts, the Court must further consider that the reason a
10  factual record cannot now be better developed is because the government disposed
11  of the very evidence on which it seeks to base the defendant's conviction.

12      Allowing the government to proceed with Count Two not only tempts an
13  unjust conviction, it also threatens that such a conviction will have been unfairly
14  won.  While the evidence strongly suggests another cause of death, the government
15  has deprived Mr. Shepley of the means to prove it.

16      It is for reasons of judicial economy and fairness to defendants that district
17  courts "are directed to dispose of all motions before trial if they are capable of
18  determination without trial of the general issue."  *United States v. Jones*, 542 F.2d
19  661, 664–65 (6th Cir. 1976).  A pretrial motion to dismiss need not purely raise a
20  question of law so long as the court is capable of making preliminary findings of
21  fact that do not invade the province of the ultimate finder of fact.  *Id*.  In this
22  instance, the defendant is not asking the court to assess a defense.  Rather, the
23  defendant is seeking to have the court act as a gatekeeper to determine whether the
24  sufficiency and reliability of the evidence is enough to support a conviction.  If not,
25  the Court has a responsibility to protect due process by dismissing spurious
26  charges.

27      So long as an issue is capable of determination without the trial of the
28  general issue, it is appropriate for adjudication by pretrial motion.  *United States v.*

18

1   *Barletta*, 644 F.2d 50, 57–59 (1st Cir. 1981).  Certainly, if the Court is aware of the
2   totality of the evidence and its infirmities, it can determine whether based on such
3   evidence, it would allow a jury's conviction to stand.  If not, it is in the interest of
4   justice, as well as propriety, to dismiss an insufficient charge as early as possible.
5   Even when an issue is not entirely segregable from the evidence to be presented at
6   trial, the court, in its discretion, may choose not to defer it and find it appropriate
7   for determination by motion.  Certainly, that is the case when the issue of the
8   sufficiency of the proof is impossible to adjudicate based on the qualitative
9   deficiency of the evidence itself.  As the expert evidence sets forth, the toxicology
10  and medical report show only that K.S. had used heroin at the time of his death.
11  Although significant medical evidence, such as the lack of evidence of respiratory
12  failure, indicate another cause of death, this critical avenue of investigation can not
13  be taken because the evidence was destroyed before Shepley was ever even
14  indicted.

15        Even if a an issued raised in a pretrial motion does overlap with trial
16  evidence, the court may yet consider a pretrial motion to dismiss when review of a
17  substantial portion of that evidence is not required.  *Shortt Accountancy*, 785 F.2d
18  at 1452 (citing *United States v. Barletta*, 644 F.2d 50, 57–58 (1st Cir. 1981)).

19        Importantly, the Court can rule on this motion while assuming the basic facts
20  set out in the indictment are true.  At least for purposes of this motion, the
21  defendant is not challenging the core allegation that he was involved in procuring
22  heroin for K.S.  Accordingly, Shepley is not challenging the facts surrounding the
23  commission of the alleged offense.  Rather, he merely seeks to have the court
24  "resolve issues of fact peculiar to the motion."  *United States v. Conley*, 859 F.
25  Supp. 909, 928 (W.D. Pa. 1994) (citing *United States v. Covington*, 395 U.S. 57,
26  60 (1969)).  Under Rule 12(b), the Court is fully authorized to find as a matter of
27  law that the evidence is too equivocal and fails to establish a but-for cause of death
28  when other probable causes were never considered or ruled out.  Because the state

1  of this evidence is inadequate to convict beyond a reasonable doubt, its

2  admissibility and weight can and should be determined at this time.

3       In this case, the sum of the evidence is contained in the report of the medical

4  experts who have examined the toxicology results.  The Court has merely to review

5  scientific facts to see if the evidence is sufficient to present a jury question.  If it is

6  not, or is simply too deficient to permit a fair trial, it is defendant's position that

7  the only reasonable course of action is to dismiss the indictment.

8  **F.**   ***The Court Must Hold a Hearing on the Admissibility of the Toxicological***

9      ***Evidence***

10       If the Court is not convinced that evidence should be admitted, it must hold a

11  hearing under Rule 702 of the Federal Rules of Evidence to determine whether the

12  evidence meets the basic rules of admissibility and adheres to the standards of

13  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Under Rule

14  702, expert testimony will only be admitted if the testimony will assist the trier of

15  fact (subd. (a)); and is based on sufficient facts or data (subd, (b)), and derives

16  from reliable principles and methods (subd. (c)) that were applied to the facts of

17  the case (subd. (d)).

18       As a hearing will show, the Medical Examiner's conclusions about the cause

19  of death are clearly inadmissible under Section 702.  Most importantly, it fails the

20  very first criterion because the toxicology report is based on insufficient facts

21  (femoral blood alone) and produced inadequate data.  While it may be that "very

22  high levels of heroin do not need to be detectable in heroin overdose deaths," as

23  Dr. Young claims, it is patently illogical to draw the conclusion that the presence

24  of a non-lethal level of heroin can be legally or scientifically posited as a cause of

25  death, let alone a but-for cause.  Under the government's test, if someone happens

26  to die while on heroin, no matter the quantity, the person who allegedly sold it will

27  be responsible for the death.  Not only does this make a mockery of causation, it

28  takes a Russian Roulette approach to charging decisions where luck, rather than

1   responsibility, determines culpability.

2        The other 702 factors also make Young's opinion inadmissible.  In this case,

3   Young has opined that heroin was the cause of death despite medical evidence that

4   is equivocal at best.  There is no way that such ambiguous expert testimony could

5   have any use in establishing the but-for cause of death beyond a reasonable doubt.

6   As even Young appears to admit, the amount of heroin in the decedent's blood was

7   not at a very high level.

8        Under *Daubert*, this court is a gatekeeper, deciding whether evidence is

9   competent to prove a matter of consequence to the proceeding.  509 U.S. at 597.  In

10  fact, the primary question that Rule 702 and *Daubert* ask is whether "scientific,

11  technical, or other specialized knowledge will assist the trier of fact to understand

12  the evidence or to determine a fact in issue." *Id*. at 589.  *Daubert* assigns the trial

13  judge "the task of ensuring that an expert's testimony both rests on a reliable

14  foundation and is relevant to the task at hand." *Id*. at 597.  Dr. Young's conclusion

15  as to the cause of death does not meet either criteria.  First, it does not rest on a

16  reliable foundation because the amount of heroin in the decedent's blood was well

17  below that ordinarily found in cases of overdose.  The opinion also cannot be

18  deemed relevant because it amounts only to a finding that heroin could have a

19  contributing cause of death because it was merely present.  The failure to rule out

20  other likely causes of death under this factual scenario renders Young's testimony

21  far more misleading than relevant with respect to determining a cause of death.

22        The factors that *Daubert* identifies demonstrate that this evidence is

23  hopelessly flawed and should not be admitted.  For example, *Daubert* asks whether

24  the theory has been tested and subjected to peer review and publication. *Id*. at 593.

25  In this case, Dr. Young's conclusion that heroin was the cause of death is at odds

26  with the peer reviewed literature that uses a much higher concentration of heroin to

27  identify it as the cause of death.  Likewise, relying on a sub-lethal dose of heroin as

28  the cause of death can only produce an exponential  potential rate of error. *Id*. at

21

593.

*Daubert* was followed in the Supreme Court by *General Electric Co. v. Joiner*, 522 U.S. 136 (1997).  *Joiner* specifically involved a situation, such as that in this case where there is a disconnect between the scientific evidence and the expert's conclusion.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Id*. at 146.  As is the case here, the court can find that the proffered expert opinion is not supported by the relevant scientific literature.  Evidence that heroin could have contributed to the death is not at all the same as finding that it was the but-for cause of death.  Permitting testimony that confuses the two standards can only lead to a miscarriage of justice.

When considering the holding in *Daubert* on remand, the Ninth Circuit observed that experts may not diverge from the methodology employed in the relevant scientific community.  Thus, when an expert offers an opinion on a cause of death that is unsupported by the relevant literature, it should not be admitted.  Citing a holding from an earlier case, *United States v. Solomon*, 753 F.2d 1522, 1526 (9th Cir.1985), the Ninth Circuit found that *Daubert* imposes a rigorous for the scientific technique that an expert employs.  "It does not suffice that the expert's methodology meet some of the requirements imposed by the scientific community; it must meet all of the essential requirements. Selective borrowing from generally accepted scientific methodology does not satisfy Solomon's rigorous standard."  Inasmuch as Dr. Young's opinion ignored the available peer-reviewed literature on heroin toxicity, the evidence is inadmissible and insufficient to support its admissibility.

///

///

1

## CONCLUSION

2    Following a hearing on the foundation for Dr. Young's hearing and the

3 admissibility of his opinion evidence, the court should find, based on the foregoing

4 that Dr. Young's testimony does not meet the standards of *Daubert* or Rule 702

5 and should therefore be excluded from evidence.  Without any evidentiary support,

6 the charge in Count Two should be dismissed as not presenting a legal basis for the

7 jury to convict.

8 Dated: April 20, 2021                    Respectfully submitted,

9                                          LAW OFFICES OF VICTOR SHERMAN

10                             By:    /s/ Victor Sherman

11                                    _____
                                      VICTOR SHERMAN
12                                    Attorney for Defendant,
                                      BRADFORD SHEPLEY

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28